Nott, J.,
delivered the opinion of the court.
These are forty-five several actions brought to recover 20 /per centum, on the compensation paid to the respective claimants. *228 during tbe fiscal year ending June 30,1867, and tbe damages claimed amount in tbe aggregate to $22,205.
Tbe claimants allege tbat tbey are “ employés in tbe Treasury Department.” Tbe evidence shows tbat tbey are employed in tbe “ National Currency Bureau,” and tbat they are bank-note printers. u They are paid so much athousand sheetsfor tbe work tbey do; sometimes by thehundred — it depends upon tbe kind of work tbey are employed on; tbe amount of their pay depends upon tbe amount of work tbey do; they are not appointed by tbe Secretary of tbe Treasury, but by tbe Chief of tbe Division; there are three exceptions with regard to their pay, viz: Charles G-. Evans, Charles B. Smith, and Owen T. Edgar, who being foremen are paid so much per day for their services.”
Tbe cases, therefore,' are similar though several, except tbat three of tbe men are foremen and paid by tbe day; while forty-two are workmen and paid by tbe sheet. Their pay is neither fixed nor limited by law; and tbey are, in fact, contractors employed by the Chief of tbe Division. Tbe u First Division of tbe National Currency Bureau,” as it is termed, is a division established by tbe Secretary of tbe Treasury under tbe power given to him to “ issue fractional notes ” and to “ provide for tbe engraving, preparation, and issue thereof, in tbe Treasury Department building.” Act M March,, 1863, (12 Stat. L., 709, § 4.) Tbe actions are brought under tbe Joint Resolution 28th, February, 1867, (14 Stat. L., 569,) which provides tbat there shall be allowed and paid to certain “ described persons now employed in tbe civil service of tbe United States at Washington” u an additional twenty per centum of their respective salaries as fixed bylaw, or, where no salary is fixed by law, upon their pay, respectively, for one year from and after tbe 30th June, 1866:” And it is supposed tbat these are within and ruled by several cases brought under tbe same joint resolution. (Mallory's Case, 3 C. Cls. R., pp. 257, &c.) On tbe part of tbe claimants it is said that tbe cases appear to be too plain for argument; and on tbe part of tbe defendants it has been .assumed tbat tbe cases come within tbe terms of tbe joint resolution and within tbe former decisions of tbe court. We have not found them, however, to be so plainly favorable to tbe claimants, but have come, on tbe contrary, to an adverse conclusion.
"The joint resolution upon which tbe actions rest is exceed *229 ingly broad, and as tbe actions depend entirely upon tbe construction to be given to it, it will be best to quote it in full:
“ Resolved by the Senate and Souse of Representatives of the United States of America in Congress assembled, That there shall be allowed and paid out of any money in tbe treasury not otherwise appropriated, to tbe following described persons now employed in tbe civil service of tbe United States, at Washington, as follows : To civil officers and temporary and all other clerks, messengers, and watchmen, including enlisted men detailed as such, to be computed upon tbe gross amount of tbe compensation received by them; and employés, male and female, in tbe Executive mansion and in any of tbe following named departments, or any bureau or division thereof, to wit: State, Treasury, War, Navy, Interior, Post Office, Attorney General’s, Agricultural, and including civil officers and temporary and all other clerks and employés, male and female, in tbe office of tbe Coast Survey, Naval Observatory, Navy Yard, Arsenal, Paymaster General, including tbe divisions of referred claims, Commissary General of Prisoners, Bureau of Befugees, Freedmen and Abandoned Lands, Quartermaster’s, Capitol and Treasury extension, City Post Office, and Commissioner of Public Buildings; to tbe photogropher of tbe Treasury Department, to tbe superintendent of meters, and to lamp-ligliters under tbe Commissioner of Public Buildings, an additional compensation of twenty per centum on their respective salaries, as fixed by law, or, where no salary is fixed by law, upon their pay, respectively, for one year from and after tbe 30th day of June, 1866; but when any of said persons is or shall be only entitled to receive salary or pay for apart of said year, tbe said twenty per centum .shall be computed on tbe amount such person is so entitled to receive for services in any or all of said departments or offices within said year:
“ Provided, That the above-named additional compensation to tbe employés of tbe Patent Office shall be paid out of tbe funds of said office.
“ Provided further, That this resolution shall not apply to persons whose salaries, as fixed bylaw, exceed three thousand five hundred dollars per annum.”
It will be noted that tbe resolution embraces every'executive department, and that it includes by name generally “ civil officers,” “clerks,” “messengers,” “watchmen,” and “employés.” *230 It then, for greater certainty apparently, includes as coining under tbe foregoing general provision tbe “civil officers,” “ clerks,” and “ employés” in certain bureaus and public offices and upon certain public works. It also, with tbe same design of comprehension, includes one or two persons wbo might well be deemed to be “ employés” in a department, as tbe “ photographer of the Treasury Department,” or the “superintendent'of meters under the Commissioner of Public Buildings.”
As has been said, the resolution is exceeding broad. The term “employés” alone, when extended to every executive department unrestrained, might be deemed to include everybody “at Washington” in anyway acting for or connected with the government. The question is, whether the term is so utterly unrestrained that everybody at Washington in any way employed by the government is of right entitled to the benefits intended to be conferred.
The first constructive limitation set upon the resolution seems to have been by the Comptroller of the Treasury. The principle upon which his construction went is not stated in his decision; but from the cases rejected by him it has been surmised that he construed the words “ m the Executive mansion,” uin any of the following-named departments,” “ in the office of the Coast Survey,” to restrict the benefits of the resolution to those officers, clerks, messengers, watchmen, and employés whose services lay actually within the buildings familiarly known as departments, bureaus, offices, &c.* To test this ruling several actions were *231 brought in tliis court. One case was that of the “ public gardener” at Washington; another, that of a member of the “Capitol' police f a third, of a laborer in the Capitol, specially authorized by Congress; the fourth, of a laborer on the public grounds; and the fifth, that of a watchman at the Smithsonian Institute. All of these claimants were employed under and by the Commissioner of Public Buildings, “the office” of whom is expressly named in the joint resolution; and the salary or pay of each *232 was expressly fixed or limited by law. On the decision of these five cases it was conclusively shown by our brother Peck, who delivered the opinion of the court, that the words “department,” “bureau,” or “office,” as used in the resolution, do, and ever have been held to, refer in statutes “ to the functions to be performed, and not to the place where they are performed.” {Stone’s Case, 3 C. Cls. R., p. 260.) The attention of the court was not directed to any other question of construction, and nothing more than this point was determined by those cases. Therefore, the extent of the decisions simply was (regard being given to the facts upon which thejr were decided) that civil officers and employés in the civil service at Washington, whose salaries were fixed by law, came within the true intent and meaning of the resolution, whether their work lay within or without the walls of the department or office within which, in contemplation of law, they were employed.
There have always been, and were when the joint resolution was passed, two classes of persons in the employment of the government. The first consists of those whose services are special and to be distinguished from ordinary employments. They make up “ the civil service of the United States,” and their compensation is directly fixed or indirectly limited by law. The second class consists of those persons whose services are such as might be rendered to any employer; whose wages come under the restrictions of no statute, and who receive for their services whatever such services may be worth in the place where they happen to be rendered. For services which are connected with the government as a government, and which, being special, have no market value, the salary, pay, or other compensation, is necessarily fixed by law; but, where the government has become a builder or manufacturer, it has never attempted to regulate by law the fluctuating value of labor, which, like other commodities, competition and the business of the country would control despite legal restrictions, nor to overbid other employers in the labor market, but has paid to its artisans and workmen the same prices for their industry which other employers might be paying for the same services in the same place. Generally, this policy has been left to regulate itself between the demands of labor on the one hand and the restraining duty of the officers charged with the hiring of workmen on the other; occasionally, it has been prescribed by law.
*233 Concerning persons in tbe civil service, we find in tbe statutes constant reference to tbe “pay authorized by law.” In tbe Act 23d, April, 1854, (10 Stat. L., 276,) to tbat of “ messengers” and 11 watchmen” “of tbe different executive departments of tbe government in Washington,” to tbat of tbe “public gardener” and tbe “police at the Capitalin tbe Act 13th August, 1856, (11 Stat. L., 145,) to tbat of “laborers in tbe employment of tbe government in tbe executive departments and on tbe public grounds in tbe city of Washington,” which, for example, tbe act fixes at “ an annual salary of $600 eachin tbe Act 14th March, 1864, (13 Stat. L., 22, § 6,) to tbat of “females ” whom tbe beads of departments “are authorized to employ” “at an annual compensation not exceeding $600;” in tbe Act 2d March, 1865, (13 Stat. L., 445, 450,) to tbat of “temporary clerics,” with a special proviso tbat they “be classified according to tbe character of their services.” But with respect to persons not in tbe “civil service,” we find no provisions of law regulating their pay except such as direct tbat “the hours of labor and tbe rate of wages of tbe employés in tbe navy yards shall conform, as nearly as is consistent with the public interest, with those of private establishments in the immediate vicinity of the respective yards:” Act IQthJtdy, 1862, (12 Stat. L., 587.)
At tbe time when tbe joint resolution was passed tbe compensation of tbe great body of persons in tbe civil service at tbe seat of government bad been left for a long time unrevised, and hád fallen into great disorder. By reason of tbe depreciation of gold and silver, and tbe still greater depreciation of paper money wherewith these persons were paid, their compensation bad become incommensurate with tbe increased expenses of tbe times, and particularly with tbe increased values set upon property and tenements in tbe city of Washington, and bad fallen far behind tbe increase allowed by tbe government to that other body of persons whose rate of compensation kept pace with tbat paid by private employers. Thus tbe very officer of tbe Treasury whose decision stopped tbe payment of these claims, and upon whose judgment depended in this matter alone more than half a million of dollars, was at tbat time receiving exactly tbe same compensation received by one of these claimants, and tbe average of them all fell but 30 per cent, below bis salary. Tbat salary bad not been increased since 1799, Act 2d March, 1799, (1 Stat. L., 729,) and but once *234 since tbe office of Comptroller of the Treasury was established in 1789, Act 2d September, 1789, (1 Stat. L., 65.) On tbe contrary, it bad been diminished by being paid in depreciated paper money instead of in gold and silver. Tbe members of that Congress which fixed tbe Comptroller’s salary at $3,500 a year themselves received but about $1,200. Tbe per diem allowance, received by them, in fact amounted, for tbe three laborious sessions of their two years’ term of office, to $2,406. But tbe pay of that Congress which passed this 20 per cent, resolution bad advanced, and properly, to $5,000 a year, exclusive of mileage. Tbe expenses of life bad also more than trebled between 1799 and 1867. Talcing them as tbe standard, we may estimate that tbe Comptroller’s salary in 1867 should have been $9,000 a year in gold; or, talcing tbe congressional salary as tbe standard, we may conclude that, if tbe Congress which increased tbe pay of Comptroller in 1789 bad legislated in 1867, they would have advanced tbe salary to $12,000 a year iu treasury notes. A third standard of comparison may be found in tbe wages paid to these claimants; for it is pretty certain that tbe artisans of that day would not have received (in gold) a fourth part of tbe Comptroller’s salary; whereas these have received, in tbe average, 70 per cent, of bis salary, and, in one case, an amount exactly equal.
When we recall tbe poverty of the young republic in 1789, tbe comparative littleness of its business transactions, tbe incomparably lesser responsibilities and duties of its chief financial officers, there appears in tbe liberality of tbe fifth Congress something great and noble, a just determination to make its civil officers independent and respected — a lofty policy designed to secure, and which did secure for tbe civil service respectable talents and irreproachable character.
In these intervening seventy years tbe daily toil of tbe artisan has diminished; but tbe labor and duties and responsibilities of tbe Comptroller’s office have been vastly augmented. They embrace tbe work of examining all accounts settled by tbe First and Fifth Auditors, and of certifying tbe balances arising thereon to tbe Register; of countersigning all warrants drawn by tbe Secretary of tbe Treasury which may be warranted by law; of reporting to tbe Secretary tbe official forms to be issued to tbe different officers for collecting tbe public revenue, and tbe manner of keeping and stating tbe accounts of tbe persons em *235 ployed therein; of superintending tbe preservation of tbe public accounts subject to bis revision, and providing for tbe payment of all moneys wbicb may be collected; of superintending tbe recovery of all debts due to tbe United States, and directing legal proceedings to enforce tbeir prompt payment, and of lay-big before Congress annually a list of sucb officers as shall bave failed to make tbe settlements required bylaw. (Act 3cl March, 1817, 3 Stat. L., 367, §§ 8, 10, 13, 14.) Tbe single requirement tbat all warrants drawn by tbe Secretary of tbe Treasury “which shall he warranted hy lato,'” be countersigned by tbe Comptroller, obliges tbat officer to pass to a certain extent upon tbe legality of every payment made by tbe United States; and in tbe fiscal year to wbicb tbis twenty-^per centum applies there were 40,814 warrants drawn, requiring of tbe Comptroller 40,814 signatures given with bis own band.
But these cases furnish a further illustration. They disclose forty-five bank-note quintéis in a bureau of tbe Treasury whose yearly wages amounted to $111,024. Tbe largest received by any one man was $3,500, tbe smallest $2,039; three of tbe 45 were above $3,000; 15 above $2,500 ,• all but nine above $2,200. In tbe same bureau tbe employés of tbe civil service who were watchmen or laborers received but $600 5 those who were messengers, but $840; those who were clerks, but $1,200, $1,400, $1,600, or $1,800. The Superintendent of Printing, under whom these men worked, received but $2,000; tbe Chief of tbe Currency Division, by whom they were employed, but $3,000. Tbe deputy Comptroller of tbe Currency, an official whose responsibilities are of so grave a nature tbat be is required by statute to give security to tbe amount of $50,000, received less than tbe wages paid to one-third of tbe workmen. And finally, chiefs of divisions in tbe Auditors’ and Comptrollers’ offices, who pass in a single year upon accounts literally embracing millions of dollars, received less than tbe least of these claimants.
Tbe salaries and pay wbicb Congress undertook to increase by law were tbe salaries and pay wbicb were regulated by law. Cases indeed are spoken of “ where no salary is fixed hy lawfi but those were tbe cases of temporary clerks — persons in tbe civil service and whose salaries though not directly “fixed” were nevertheless indirectly limited by law. Persons also are enumerated in certain military and naval offices, but they were *236 persons who, acting under military and naval authority, still were, as we held in Claris Case, (1 C. Cls..B., p. 145,) “persons engaged in the civil service of the United States.” The joint resolution was not a wild gratuity — a naked, needless gift of the bard-paid taxes of the nation — but was founded on an intent to do justice to those persons in the civil service who had not been compensated justly for their services. The joint resolution was therefore a remedial statute, to be construed by the well-known tests “the old law, the mischief, and the remedy.” The “ old law” here was the various statutes establishing, regulating, and limiting the compensation of persons in the civil service. Where there was no old law and employés received for their services what they were worth among men, the new law did not apply; they who had no wrongs to be righted needed not the remedy which it provided. The “ mischief ” was the unjust compensation which, by the changed circumstances of the nation, had come to he paid to persons in the civil service, occasioning irritation, discontent, and a sense of wrong in the minds of men, and leading to bribery, extortion, and other evil practices. The "remedy” intended by the resolution, lies notin flinging the money of a people struggling with a great debt to those who received for their services their highest market value, merely because such services chanced to be rendered at the seat of government where persons in the civil service chiefly are employed, but in faithfully extending the statute to all those actually in the “ civil service of the United States” whose compensation was restricted by law, and who, being circumscribed in their means of subsistence by the arbitrary operation of law, could look only to the law for the bettering of their condition. And th erefore it is that the j oint resolution, though loosely and recklessly drawn, is still careful to say that the “ twenty per centum” to be allowed and paid shall be to “persons now employed in the civil service of the United States.”
The phrase limits and controls all that follows. The “clerks, messengers, watchmen, and emifloyés” mentioned are not all the persons employed by the government at Washington, but only the persons employed “in the civil service” of the United States, and whose service was rendered within the functions of the offices named. These claimants were not persons in the civil service; they were simply hired by the job or the day to do common mechanical labor, and paid for their work all it was *237 worth in the market. Instead of being public servants, they were merely public contractors. The government owes them no gratuities more than it owes all other contractors, and it has paid to the least of them more than double the average which it pays to persons in the civil service at Washington. “It is the business of the judges so to construe the act as to suppress the mischief and advance the remedy,” and we shall most assuredly do so if we extend it to all who are both within the letter and the spirit of the joint resolution, and to none beside.
The judgment of the court is, that the petition in this and each of the cases submitted with this be dismissed. .
Loring, J., dissented.

 The following letter from the Comptroller was received after the rendition of the judgment in these cases. The decisions quoted were never made known to the court, nor set forth in the claimant’s petitions, as required by Rule II:
“Treasury Department,
“Office of the First Comptroller,
“ May 25, 1869.
1 ‘ Sir : I find the following endorsed by me on a communication of persons employed in the printing division of the Treasury Department, addressed to the Secretary of the Treasury :
“ ‘Comptroller’s Office, May 15, 1867.
1 ‘ ‘ Before making the decision in the case of the persons employed in Mr. Clark’s division, be reported to me the names, the manner of employment, the work in which each was engaged, the compensation and mode of payment. From this I learned that they were not paid a compensation fixed by law, or by regulation of the department; but such compensation as their labor was thought worth, and as was agreed upon. This compensation had been vaiied and increased as the value *231 of labor rose, and was subject to like increase thereafter. And if they worked over-time they were paid for such over-work — an advantage not enjoyed by any of the employés of the department or the officers or bureaus thereof, or of those having salaries fixed by law or regulation. Some of these men were paid for as jnany as 40 to 48 days’ work during February. They were not, therefore, within the intent or object of the resolution ; the intent being to pay additional compensation where that allowed was insufficient for the services rendered. In case of these men their employment and mode of payment show that they are compensated according to the value of their labor; and therefore further payment would not be compensation, but a gratuity, which it is evident Congress did not mean to bestow.
“ ‘ If the compensation now paid them, or paid during the current year, is inadequate, the remedy is in an increase of the same by the Secretary or Mr. Clark, (and the power is adequate,) instead of under the resolution.
“ ‘ It is at best exceedingly doubtful that these men are employes of the department in the sense in which the word is used in the resolution. I do not think the printing, engraving, &c.. aud other artistic and mechanical work, constitute any portion of the treasury business, although under the employment 'of Mr. Clark.’
“ In a communication to the Assistant Secretary of the Interior, dated June 6, 1867, and having reference to persons engaged on the Capitol extension, I said : ‘The resolution seems to have originated in the opinion that certain officers and others in the civil service of the government at Washington were not adequately compensated for their services. This opinion could have reference to those only who had their compensatisn fixed by law or by departmental regulations assimilating compensation to that fixed by law for like services, and not to those whose pay was fixed by outside circumstances or influences, or by market value, and subject to rise and fall with the market. In the former case, the allowance was only compensation for services not adequately paid, whereas in the latter it would seem to be a gratuity ; and it is not to be presumed that Congress intended to bestow a gratuity in the absence of a clear expression of sueh intent.’
“ In looking over the case reported in the third volume of Reports, I conclude that the views taken by me of those cases could not have been fully presented to the court. I certainly did. not entertain some, at least, of the opinions which the court combat and overrule.
“ Sincerely yours,
“R. W. TAYLER.
“ Hon. Chas, C. Nott,
“ Court of Claims.”